J-S13009-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : IN THE SUPERIOR COURT OF |
| | :        PENNSYLVANIA |
| | : |
| v. | : |
| | : |
| | : |
| | : |
| JEROME KING | : |
| | : |
| Appellant | : No. 2929 EDA 2024 |

Appeal from the PCRA Order Entered October 23, 2024
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0009432-2017

BEFORE: PANELLA, P.J.E., NICHOLS, J., and KING, J.

MEMORANDUM BY PANELLA, P.J.E.: **FILED JULY 8, 2026**

Jerome King appeals from the order entered in the Court of Common Pleas of Philadelphia County denying his first timely Post Conviction Relief Act ("PCRA")[1] petition. On appeal, King raises various ineffective assistance of counsel claims. After careful review, we affirm.

We glean the following from the certified record. On June 20, 2017, Marvin Brunson ("Victim") was fatally shot in the chest with a .45 caliber semiautomatic firearm while inside his vehicle at the intersection of 29th Street and Cecil B. Moore Avenue in Philadelphia. Officers determined that the bullets traveled from the rear passenger side of Victim's vehicle through to the driver's seat. Three months after the murder, Detective Billy Golphin

_____

[1] 42 Pa.C.S.A. §§ 9541-9546.

interviewed Tyera Chapman, King's former girlfriend, who indicated that King admitted to her that he shot Victim. Based upon, *inter alia*, Chapman's statements to police and video surveillance footage recovered from the crime scene, King was charged with various offenses relating to the murder.

At trial, King was represented by Richard Giuliani, Esq. and Anthony Petrone, Esq. (collectively, "trial counsel"). On November 9, 2018, a jury convicted King of first-degree murder, firearms not to be carried without a license, carrying firearms on public streets or property in Philadelphia, and possession of an instrument of crime.[2] On that same date, the court imposed a mandatory sentence of life imprisonment for King's first-degree murder conviction and no further penalty for King's remaining convictions. King timely filed a post-sentence motion, which the court denied on December 26, 2018. On December 16, 2019, a panel of this Court affirmed King's judgment of sentence. *See Commonwealth v. King*, 2019 WL 6840607 at *1 (Pa. Super. filed Dec. 16, 2019) (unpublished memorandum). King subsequently filed a petition for allowance of appeal, which our Supreme Court denied on June 23, 2020. *See Commonwealth v. King*, 236 A.3d 1048 (Pa. 2020) (*per curiam* order).

The PCRA court accurately summarized the subsequent procedural history as follows:

_____

[2] 18 Pa.C.S.A. §§ 2502(a), 6106(a)(1), 6108, and 907, respectively.

[King] timely filed a *pro se* [PCRA] petition [] on December 11, 2020. [] Teri B. Himebaugh, Esq. thereafter entered her appearance on behalf of [King] and filed a counseled amended petition, followed by a series of amendments, corrections, and supplements to the counseled amended petition[.] ... The Commonwealth moved to dismiss the amended petition and counsel responded. [] Jack McMahon, Esq. then entered his appearance on behalf of [King] as co-counsel.

After a review of the trial record, the amended petition, the Commonwealth's motions to dismiss, and [King's] responses thereto, the court found that only one of the claims raised in the amended petition, [*i.e.*, King's] claim alleging that trial counsel [was] ineffective for failing to interview and call Raheem Smith as a defense witness at trial, had arguable merit and required an evidentiary hearing.

[On October 23, 2024, the court conducted an evidentiary hearing] limited to the above-mentioned claim. At the evidentiary hearing, testimony was given by Raheem Smith, as well as [King's] trial counsel. ... Following the evidentiary hearing, the court determined that there was no merit to [King's ineffectiveness] claim[.] Thereafter, the court entered an order dismissing the amended petition.

[On October 24, 2024, King filed a notice of appeal,] and both [Attorney] Himebaugh and [Attorney] McMahon [(collectively, "PCRA counsel")] sought to withdraw their representation. On December 18, 2024, following a hearing, [the] court permitted [PCRA] counsel to withdraw[.]

PCRA Court Opinion, 7/2/25, at 2-3 (unnecessary capitalization and footnotes omitted). King subsequently retained private counsel to represent him in this appeal. Both King and the PCRA court have complied with Rule 1925. **See** Pa.R.A.P. 1925(a), (b).

On appeal, King presents the following questions for our review:

1. Did [] the lower court err and abuse its discretion by denying a remand for development of King's claim that PCRA counsel was ineffective for failing to raise a claim asserting trial counsel's

ineffectiveness for not objecting to the irrelevant, inadmissible, and prejudicial evidence of King's alleged possession of a .38 caliber gun and .32 caliber ammunition that was unrelated to the charges in this case, and for failing to request a limiting instruction?

2. Did [] the lower court err and abuse its discretion by denying a remand for development of King's claim that PCRA counsel was ineffective for failing to raise a claim asserting trial counsel's ineffectiveness for not objecting to the hearsay testimony of Detective Billy Golphin identifying an alleged eyewitness to the incident, thereby allowing the Commonwealth to suggest that the person who Golphin identified, who had intentionally failed to appear at King's trial, did so because he feared identifying King as the perpetrator; and did [] the lower court further err and abuse its discretion by denying a remand for development of King's claim that PCRA counsel was ineffective for failing to raise a claim asserting trial counsel's ineffectiveness for not requesting a limiting instruction regarding [Detective] Golphin's identification of the eyewitness?

3. Did [] the lower court err and abuse its discretion by denying a hearing and relief for King's claim that trial counsel was ineffective for failing to object to the video surveillance evidence at trial based on the Commonwealth's failure to satisfy the authentication requirements of Pa.R.E. 901(a)?

Appellant's Brief, at 4-5 (numbering provided; formatting altered; PCRA court answers omitted).

King avers that the PCRA court erred in denying his ineffectiveness claims without conducting an evidentiary hearing. "Our standard of review regarding an order denying a petition under the PCRA is whether the determination of the PCRA court is supported by the evidence of record and is free of legal error." *Commonwealth v. Cruz*, 355 A.3d 1, 4-5 (Pa. Super. 2026) (citation omitted).

We view the findings of the PCRA court and the evidence of record in a light most favorable to the prevailing party. With respect to the PCRA court's decision to deny a request for an evidentiary hearing, or to hold a limited evidentiary hearing, such a decision is within the discretion of the PCRA court and will not be overturned absent an abuse of discretion. The PCRA court's credibility determinations, when supported by the record, are binding on this Court; however, we apply a *de novo* standard of review to the PCRA court's legal conclusions.

***Commonwealth v. Baynard***, 355 A.3d 21, 25 (Pa. Super. 2026) (brackets and citation omitted). "This Court may affirm a PCRA court's order on any legal basis." ***Commonwealth v. Pridgen***, 305 A.3d 97, 101 (Pa. Super. 2023) (brackets and citation omitted).

"The test for ineffective assistance of counsel is the same under both the Federal and Pennsylvania Constitutions." ***Commonwealth v. Gibson***, 318 A.3d 927, 934 (Pa. Super. 2024) (citations omitted).

To establish a claim of ineffective assistance of counsel, a [petitioner] must show, by a preponderance of the evidence, ineffective assistance of counsel which, in the circumstances of the particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place. The burden is on the [petitioner] to prove all three of the following prongs: (1) the underlying claim is of arguable merit; (2) that counsel had no reasonable strategic basis for his or her action or inaction; and (3) but for the errors and omissions of counsel, there is a reasonable probability that the outcome of the proceedings would have been different.

***Commonwealth v. Nealy***, 333 A.3d 393, 399 (Pa. Super. 2025) (brackets and citation omitted).

To establish prejudice, a petitioner "must prove actual prejudice, that is, a reasonable probability that, but for counsel's lapse, the result of the

- 5 -

proceeding would have been different." ***Commonwealth v. Knight***, 348 A.3d 1155, 1177 (Pa. Super. 2025) (emphasis, ellipses, and citations omitted). In this context, "[a] reasonable probability is a probability that is sufficient to undermine confidence in the outcome of the proceeding." ***Id.*** at 1166 (citation omitted).

> In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury. Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support. Ultimately, a reviewing court must question the reliability of the proceedings and ask whether the result of the particular proceeding was unreliable because of a breakdown in the adversarial process that our system counts on to produce just results.

***Id.*** at 1177 (emphasis, quotation marks, ellipses, brackets, and citations omitted).

In his first and second issues, King raises layered ineffectiveness claims by asserting that PCRA counsel was ineffective for failing to raise claims of trial counsel's ineffectiveness.

> Where the defendant asserts a layered ineffectiveness claim he must properly argue each prong of the three-prong ineffectiveness test for each separate attorney.
>
> Layered claims of ineffectiveness are not wholly distinct from the underlying claims, because proof of the underlying claim is an essential element of the derivative ineffectiveness claim. In determining a layered claim of ineffectiveness, the critical inquiry is whether the first attorney that the defendant asserts was ineffective did, in fact, render ineffective assistance of counsel. If that attorney was effective, then subsequent counsel cannot be deemed ineffective for failing to raise the underlying issue.

***Gibson***, 318 A.3d at 932 (citation omitted).

- 6 -

Although King raised his layered ineffectiveness claims for the first time in his 1925(b) statement, they are properly before us. In **Commonwealth v. Bradley**, 261 A.3d 381, 401 (Pa. 2021), our Supreme Court held that "a PCRA petitioner may, after a PCRA court denies relief, and after obtaining new counsel or acting *pro se*, raise claims of PCRA counsel's ineffectiveness at the first opportunity to do so, even if on appeal." (footnote omitted). Where a petitioner raises a claim of PCRA counsel's ineffectiveness for the first time on appeal, the **Bradley** Court further acknowledged that:

> In some instances, the record before the appellate court will be sufficient to allow for disposition of any newly-raised ineffectiveness claims. However, in other cases, the appellate court may need to remand to the PCRA court for further development of the record and for the PCRA court to consider such claims as an initial matter. ... [T]o advance a request for remand, a petition would be required to provide more than mere boilerplate assertions of PCRA counsel's ineffectiveness[;] however, where there are material facts at issue concerning claims challenging [PCRA] counsel's stewardship and relief is not plainly unavailable as a matter of law, the remand should be afforded[.]

**Id.** at 402 (citations, quotation marks, brackets, and footnote omitted). Thus, as this Court recognizes, "**Bradley** did not guarantee a PCRA petitioner substantive review of claims of PCRA counsel's ineffectiveness, nor did it create an absolute right to remand for development of those claims." **Commonwealth v. Shields**, 347 A.3d 734, 745 (Pa. Super. 2025) (citation omitted).

In his first issue, King raises a layered ineffectiveness claim based upon trial counsel's alleged failure to object to the admissibility of evidence of a .38

caliber firearm and .32 caliber ammunition, which were recovered during a search of Chapman's residence and unrelated to Victim's murder. **See** Appellant's Brief, at 22. King further avers that trial counsel was ineffective for failing to request an instruction that this evidence "could not be considered by the jury in assessing King's guilt or innocence." **Id.** at 29. King contends that remand is warranted to further develop this layered ineffectiveness claim. **Id.** at 27-28. We disagree.

At trial, the Commonwealth established that Victim was fatally shot in the chest with a .45 caliber firearm. Detective Kevin Judge testified that he "recovered a handgun and a box of ammo" while executing a search warrant on Chapman's residence. **See** N.T. Trial, 11/7/18, at 128. On redirect examination, Chapman confirmed that officers recovered a .38 caliber firearm and a box that contained 36 live rounds of .32 caliber ammunition during their search of her residence. **See** N.T. Trial, 11/6/18, at 172-73. Detective Golphin testified that he was unaware that a firearm and ammunition had been recovered from Chapman's residence when he conducted Chapman's interview three months after the murder and that he did not have any discussions with her about it. **See** N.T. Trial, 11/8/18, at 63. Detective Golphin further testified that he later became aware of the recovered firearm and ammunition and indicated that, to his knowledge, related firearm charges had not been brought against Chapman. **Id.** at 70.

King avers that this testimony referencing an unrelated firearm and ammunition was improper and prejudicial and that "a timely objection would have resulted in the lower court precluding this evidence." Appellant's Brief, at 26. King maintains that "[t]here is no reason to believe that the jurors would have been able to disregard the prejudicial inference of [his] connection to not one, but two unrelated lethal weapons." *Id.* at 24. King further contends that, "[a]bsent a limiting instruction, the jury was given the ability to consider the gun and ammunition evidence as demonstrating King's propensity for violence and further consider that propensity as probative on the question of his involvement in [Victim's murder]." *Id.* at 30.

King's argument is unavailing, as he has failed to establish actual prejudice. *See Knight*, 348 A.3d at 1177. Specifically, King cannot demonstrate prejudice where none of the testimony at issue established that the firearm or ammunition recovered from Chapman's residence belonged to King or was used in the commission of a crime. *See* N.T. Trial, 11/6/18, at 172; N.T. Trial, 11/7/18, at 128, 139; N.T. Trial, 11/8/18, at 63-70. Furthermore, as the PCRA court summarized, the Commonwealth presented the following overwhelming evidence of King's guilt at trial:

> A video interview of [Chapman] was played for the jury as a prior inconsistent statement after she repudiated her statement testifying that she lied to police because she was afraid for herself, her son, and [King]. Although [] Chapman repudiated her statement at trial, her statement was corroborated by the surveillance video footage and [King's] cell phone records.

- 9 -

... Chapman stated that she was aware of the murder that was being investigated. Around the time of the murder, she tried to make several calls to [King] that went unanswered, but he returned her call a while later, stating that a female had called him and said that the guy he was beefing with was [] at 28th and Cecil B. Moore [Avenue. King] then told [] Chapman that he ["tied his hoodie up tight and ran upon him and killed him." N.T. Trial, 11/8/18, at 111.]

Detective [James] Dunlap reviewed the cell phone records and determined that on the date and time of the murder, [King's] cell phone was within the square mile covering the crime scene. During the same time frame, calls made to [King's] cell phone from [] Chapman's phone went unanswered and were forwarded to voicemail. Around 45 minutes after the shooting, a short call was connected between [King] and [] Chapman's phone.

The video compilation prepared by Detective [Thorsten] Lucke virtually tracked [King's] movements within a two-block radius on the various cameras in the neighborhood from the time he exited a property in the area until the time of the murder.

At 10:20 a.m., the camera at 2800 Cecil B. Moore [Avenue] shows a black male exit a building and place something in the garbage. The male is wearing dark jeans gathered at the ankle, a white t-shirt with a colorful logo, a gray hoodie draped over his shoulder, black sneakers with white trim, and a lanyard hanging out of his pocket. Multiple cameras capture the male walking north on 28th Street, making a left on Cecil B. Moore [Avenue], and then a right onto Newkirk [Street]. At 10:24 a.m., the male can be seen placing an item onto the roof of a parked vehicle on Newkirk [Street]. At 10:26 a.m., the male is seen again on Newkirk [Street] walking back toward Cecil B. Moore [Avenue and] no longer has the gray hoodie draped over his shoulder. Cameras pick the male up on Cecil B. Moore [Avenue] at 10:27 a.m., [and] the lanyard that was previously hanging out of his pocket is now around his neck. From 10:27 until 10:29 a.m., surveillance cameras inside the store capture the male shopping. As part of the compilation, the footage is frozen twice, [focusing] on the male's face, and photographs of [King] were superimposed for comparison purposes. [The defense conceded that the male depicted shopping was King but contended that the shooter was a different person.]

Also occurring at 10:27 a.m., and recorded on camera, a red vehicle later identified as [Victim's], parks on Cecil B. Moore [Avenue] between Newkirk [Street] and 29th [Street]. Upon leaving the convenience store, the male walks back toward Newkirk [Street]. As he [proceeds] toward Newkirk Street, he walks into the street on Cecil B. Moore [Avenue] and leans out into traffic as if to get a better view of something up ahead. The male continues to stand on the side of the road staring in the direction of [Victim's] vehicle for at least a minute. At 10:30 a.m., the male runs up Newkirk [Street towards] the vehicle he had previously placed the gray item on. At 10:31 a.m., a male wearing dark jeans gathered at the ankle, a white t-shirt with a logo or a lanyard, an un-zipped gray hoodie, and black sneakers with white trim, runs past Steak & All[,] a restaurant located between Newkirk [Street] and 29th [Street] on Cecil B. Moore [Avenue]. A freeze frame of the male running is compared to two other freeze frames of the male shown earlier. At 10:31:47 a.m., the male wearing the gray hoodie tied up around his face runs up [to Victim's] vehicle. It is unclear what the male is doing, but seven seconds later a previously unseen individual begins to run away from [Victim's] vehicle[,] and a car drives off rapidly. At 10:32:05 a.m., the male in the gray hoodie walks away from [Victim's] vehicle. At 10:32:15 a.m., [Victim's] vehicle drives in front of a SEPTA bus, and crashes into a parked car on 29th [Street].

PCRA Court Opinion, 7/2/25, at 8-10 (record citations and footnote omitted).

In light of the overwhelming evidence of record establishing King's guilt, we cannot conclude that, but for trial counsel's failure to object to evidence of the unrelated firearm and ammunition recovered during the search of Chapman's residence, the result of King's trial would have been different. *See* ***Knight***, 348 A.3d at 1177. Because King's underlying ineffectiveness claim fails for lack of prejudice, his layered ineffectiveness claim likewise does not afford relief. *See* ***Gibson***, 318 A.3d at 934-35. Therefore, PCRA relief is plainly unavailable, and the PCRA court correctly concluded that no further purpose would be served by conducting an evidentiary hearing for further development

of Sinclair's layered ineffectiveness claim. ***See Bradley***, 261 A.3d at 402. Accordingly, King's first issue does not warrant relief.

In his second issue, King raises a layered ineffectiveness claim based upon trial counsel's failure to object to Detective Golphin's identification of Raheem Smith as an alleged eyewitness to the shooting and to request a limiting instruction with respect to this testimony. ***See*** Appellant's Brief, at 36. King contends that "PCRA counsel [was] ineffective for failing to raise this meritorious ineffectiveness claim." ***Id.*** at 37. King further contends that he is entitled to a remand for further development of this issue where material facts are at issue and relief is not plainly unavailable as a matter of law. ***See id.*** at 36. We disagree.

In the video footage presented at trial, an individual is depicted standing outside of Victim's car at the time of the shooting. In the prosecutor's opening statement, she described the evidence that would be presented to the jury and, in doing so, stated that this individual was eventually "located and interviewed" as a part of the investigation. N.T. Trial, 11/6/18, at 41. On direct examination, Detective Golphin was questioned as to the identity of this individual, and the following exchange ensued:

Q.     Through your investigation, were you able to determine who that person was?

A.     Yes.

Q.     Who was that person?

A.     Raheem Smith.

- 12 -

Q.    Okay. At any point in time, was Mr. Smith located by police?

A.    Yes.

Q.    Okay. Since then, has Mr. Smith been cooperative with the police?

A.    No.

Q.    Has Raheem Smith come to court this week?

A.    No.

Q.    Have efforts been made to locate him and get him to court?

A.    Yes.

Q.    Did you yourself make any of those efforts?

A.    Yes.

*Id.* at 45-46.

King contends that Detective Golphin's hearsay identification of Smith prejudiced him "by improperly suggesting that [] Smith saw King commit a shooting and did not come to court because he did not want to identify him" out of fear of reprisal. Appellant's Brief, at 40. King further contends that, by indicating that police had interviewed Smith in her opening statement, the prosecutor impermissibly suggested "that [Smith] had something to say that would help the Commonwealth in its effort to convict King." *Id.* at 39-40.

The PCRA court adequately addressed King's argument as follows:

[King] argues that by mentioning the fact that [] Smith was eventually located and interviewed by police[,] while also mentioning that an arrest warrant was issued against [King during the prosecutor's opening statement], the prosecutor implied to

the jury that the information used to obtain the arrest warrant against [King] was obtained from interviewing [] Smith, who did not appear to testify as a witness at trial. This argument is logically flawed [because] the statement by the prosecutor when read in context implied that the arrest warrant issued prior to locating Smith. Furthermore, no evidence was admitted at trial regarding the interview of [] Smith.

The only evidence introduced at trial regarding Smith was testimony from Detective Golphin detailing the course of the investigation. As part of the investigation, Detective Golphin made attempts to locate a witness captured in a surveillance video from the scene of the murder. In the video, viewed by the jury, a person in a white t-shirt is depicted standing next to [Victim's] vehicle at the time of the shooting. Detective Golphin testified that police were able to identify that individual as [] Smith.

[Because] Smith failed to appear to testify at trial, the court significantly limited Detective Golphin's testimony regarding Smith. [**See** N.T. Trial, 11/8/18, at 16-19]. Detective Golphin testified that police were able to identify the unknown bystander as Raheem Smith, however, when Smith was located by the police, he was uncooperative. [**See id.** at 46]. Prior to the admission of this limited testimony regarding Smith, the court heard extensive argument as to whether to admit testimony that the person in the video standing next to [Victim's] car was identified as [] Smith. [**See** N.T. Trial, 11/7/18, at 7-21]. The court ruled that the testimony was permissible to show that the detectives investigated this lead. [**See id.** at 20.] ... [King] did not suffer any prejudice as a result of the Commonwealth's mere introduction of the existence of [] Smith as part of their investigation.

PCRA Court Opinion, 7/2/25, at 12-13 (unnecessary capitalization omitted).

We discern no error or abuse of discretion in the PCRA court's determination that this ineffectiveness claim fails for lack of prejudice. Specifically, King has not established a reasonable probability that, but for trial counsel's failure to object to Detective Golphin's identification of Smith as the individual standing next to Victim's vehicle in the video, the result of King's

- 14 -

trial would have been different. *See Knight*, 348 A.3d at 1177. Furthermore, King cannot establish that he was prejudiced by counsel's failure to request a limiting instruction when the trial court *sua sponte* informed the jury that they could not consider why Smith did not testify. *See* N.T. Trial, 11/8/18, at 190. Therefore, because King's underlying ineffectiveness claim fails for lack of prejudice, his ineffectiveness claim against PCRA counsel likewise fails, and he is not entitled to a remand for further development of his claim. *See Gibson*, 318 A.3d at 934-35; *Bradley*, 261 A.3d at 402. Accordingly, King's second issue does not warrant relief.

In his third issue, King claims that trial counsel was ineffective for failing to object to the Commonwealth's presentation of a video compilation of surveillance footage that was not properly authenticated pursuant to Pa.R.E. 901(a). *See* Appellant's Brief, at 48. King avers that the Commonwealth "failed to authenticate any of the six separate segments of the video compilation[,]" which "were obtained from six separate locations and six separate establishments," and that "the record is devoid of any evidence that the video segments are what the Commonwealth claimed them to be." *Id.* Specifically, King suggests that, to establish the authenticity of the compilation video, the Commonwealth was required to present the testimony of an individual who had personally observed the shooting occur, and thereby had "knowledge that the images displayed for the jury fairly and accurately depicted the events[,]" or an individual who had "any knowledge about the

process taking place at the six locations where video evidence was captured." *Id.* at 49, 52. We disagree.

"To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is. Pa.R.E. 901(a). Authentication generally entails a relatively low burden of proof." *Commonwealth v. Nabried*, 327 A.3d 315, 323 (Pa. Super. 2024) (brackets and internal quotation marks omitted); *see* Pa.R.E. 901, *Comment* ("Demonstrative evidence such as photographs, motion pictures, diagrams and models must be authenticated by evidence sufficient to support a finding that the demonstrative evidence fairly and accurately represents that which it purports to depict."). A proponent can satisfy the authentication requirement by presenting the testimony of a witness with knowledge "that an item is what it is claimed to be." Pa.R.E. 901(b)(1). Further, a proponent can introduce evidence of "[t]he appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances" to satisfy the authentication requirement. Pa.R.E. 901(b)(4).

At trial, Detective Golphin testified that, at approximately 12:30 p.m. on June 20, 2017, he "went to the scene area of 2900 Cecil B. Moore [Avenue] … for the purposes of recovering video and [to] assist processing the scene." N.T. Trial, 11/8/18, at 43– 44. Detective Golphin testified that he was able to recover raw surveillance video footage from multiple establishments depicting

the area in question on the morning of the shooting. **See id.** at 44-45. Detective Golphin further testified that he reviewed the raw footage he recovered and that, in doing so, he had the opportunity to observe the specific time at which the shooting occurred. **See id.** at 45. Detective Golphin indicated that he provided the individual videos that he personally recovered and reviewed to Detective Lucke, who made a compilation video of the footage. **See id.** Detective Golphin testified to reviewing Detective Lucke's compilation video depicting the events that transpired on the morning of June 20, 2017. **See id.**

The parties stipulated that Detective Lucke was qualified as an expert in the field of recovery and analysis of digital surveillance video. **See** N.T. Trial, 11/7/18, at 24. Detective Lucke testified that he received raw video footage recovered by investigating officers, including Detective Golphin, from six sources, including three commercial businesses, an apartment building, a Philadelphia Police Department camera, and a SEPTA bus. **See id.** at 28-29, 31. When asked what steps he took to analyze the footage upon receiving it to create the compilation video, Detective Lucke testified as follows:

> First, I authenticated the video to identify the time offset of the individual angles that I'm looking at in order to begin to identify the relationship between the angles as well as the events or people or objects or vehicles depicted in these angles, the relationship, both in a time and space relationship to each other.
>
> And after I did that, I took all the footage, reviewed all the footage with the investigators and determined the best way to put it into a product to be used during their investigation, meaning instead of having to go from location to location, each location needs a

- 17 -

different player. You [have to] find the right camera and determine where in the footage to look for what you're looking for, which is a very time-consuming process.

We sat down and put it together in a product where all the footage after extensive review that's been determined to be of evidentiary value was put together in a consumable product where it can be viewed, and in order to, again, to show a certain chain of events.

* * *

And how we put [the compilation video] together is take footage from all the pertinent angles and systems and put it together in a mostly chronological order. I say mostly, because sometimes events are captured by more than one camera at a time. And sometimes I put them side by side. But, generally speaking, we sometimes need to watch events from one camera and watch them again from another camera as well as sometimes events are occurring in two places at the same time.

For example, inside the store while other events are occurring outside. Sometimes we have to go back in time and repeat a certain time. Generally speaking, everything I put together moves in a chronological order. And if it ever deviates from that, I would point that out or it's mentioned, as well as we utilize—we zoom in a little bit to get a better view if a camera catches something in the distance.

Some of the footage, we replay the footage to show it in ... slow motion. After certain events [occur] in regular motion first, then we slow it down to be able for somebody who is viewing it to get a better ability to view it and analyze what they see.

*Id.* at 29-31. Detective Lucke further testified that he spent "many hours" reviewing the footage with Detective Golphin to create the compilation video of the shooting area on the morning in question. *See id.* at 31-32.

The PCRA court rejected King's ineffectiveness claim for lacking arguable merit as follows:

> The detectives' testimony, coupled with the streets and landmarks depicted in the video showing the same events from multiple vantage points was sufficient to support a finding that the digital surveillance videos used to create the video compilation accurately represented the object or place reproduced as it existed at the time of the recording. No more was required. The Commonwealth's failure to produce consent recovery forms for some of the video footage merely goes to the weight of the evidence and not the admissibility. Had trial counsel objected to the admission of the video compilation, the objection would have been overruled

PCRA Court Opinion, 7/2/25, at 22 (unnecessary capitalization and footnote omitted).

We discern no error or abuse of discretion in the PCRA court's determination that this ineffectiveness claim lacks arguable merit. Notably, King's underlying ineffectiveness claim is not based on an allegation that the raw surveillance footage was fabricated or altered. *See* Appellant's Brief, at 48-54; Appellant's Reply Brief, at 11-14; *Commonwealth v. McKelick*, 24 A.3d 982, 989-90 (Pa. Super. 2011). As the trial court correctly noted, Rule 901(a) does not require that the Commonwealth produce specific forms or documentation to authenticate video evidence. Furthermore, as a panel of this Court recently explained in rejecting an argument similar to that raised by King, even if "[t]here was no first-hand testimony of the events depicted on the video" offered to establish that the video fairly and accurately represents that which it purports to depict, "that alone does not make [the Commonwealth's evidence of authenticity] insufficient." *Commonwealth v. Anderson*, 2026 WL 810774 at *6 (Pa. Super. filed March 24, 2026)

(unpublished memorandum) (finding trial court erred in rejecting personal knowledge of detective as sufficient proffer of video's authenticity "even though he was not present when the security footage was recorded and was not the custodian of the deli's DVR system").[3]

Here, Detective Golphin assisted with processing the crime scene shortly after the shooting occurred and recovered the raw video footage captured by nearby surveillance cameras, thereby providing him with the personal knowledge to confirm that the footage depicted the location in question at the time of the shooting. Detective Lucke's testimony established that he received the raw footage from Detective Golphin and reviewed the contents and substance of the individual videos with Detective Golphin in creating the compilation video to ensure that it accurately depicted the events that occurred in both geographic and temporal proximity to the shooting. Thus, the Commonwealth produced sufficient circumstantial evidence to support a finding that the compilation video "fairly and accurately represents that which it purports to depict." **See** Pa.R.E. 901(a), *Comment*. Accordingly, any objection to the admissibility of the compilation video based on authentication launched by trial counsel would have been meritless, and King's third ineffectiveness claim fails.

_____

[3] Pursuant to Pa.R.A.P. 126(b), we may rely on unpublished memorandum decisions filed after May 1, 2019 for their persuasive value.

Based on the foregoing, King is not entitled to his requested relief, and we affirm the PCRA court's order.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 7/8/2026